IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF Z'RYAH D.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF Z'RYAH D., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ERICA G., APPELLANT.

Filed July 22, 2025.    No. A-24-939.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Claudia L. McKnight for appellant.

Angela H. Heimes, of Gross, Welch, Marks & Clare, P.C., L.L.O., guardian ad litem.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Erica G. appeals from the decision of the separate juvenile court of Douglas County, terminating her parental rights to her daughter, Z'Ryah D. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Erica is the mother of Z'Ryah, born in 2013. Montez C. is Z'Ryah's father. Montez' parental rights to Z'Ryah were terminated during these same juvenile proceedings below, but he is not part of this appeal and will not be discussed any further.

Z'Ryah was removed from Erica's care in November 2019 after Z'Ryah was taken to the hospital for being in an altered mental state and her urine screen at the hospital came back positive for marijuana.

On November 25, 2019, the State filed a petition alleging that Z'Ryah was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because she lacked proper parental care by reason of the fault or habits of Erica in that:

A. Law enforcement was dispatched to University of Nebraska Medical Center after said juvenile began acting out of character, and it was later determined that said juvenile tested positive for marijuana.

B. Erica . . . is currently homeless.

C. Erica . . . has an active felony warrant.

D. Once Erica . . . learned that said juvenile had tested positive for an illegal substance, Erica . . . left the hospital and indicated she would not be returning.

E. Erica . . . has failed to provide proper parental care, support and/or supervision for said juvenile.

F. Erica . . . has failed to provide said juvenile with safe, stable housing.

G. Due to the above allegations, said juvenile is at risk for harm.

Also on November 25, the State filed an ex parte motion for immediate temporary custody of Z'Ryah to be placed with the Nebraska Department of Health and Human Services (DHHS), and the juvenile court entered an ex parte order that same day. Z'Ryah has since remained in the custody of DHHS and in foster care.

On February 25, 2020, Z'Ryah was adjudicated to be within the meaning of § 43-247(3)(a) based on Erica's admissions to the allegations in B, C, and G of the petition. The allegations in A, D, E, and F were dismissed pursuant to a plea. The matter moved to immediate partial disposition by agreement of the parties. The juvenile court ordered Erica to obtain and maintain safe, stable, and adequate housing and provide proof to the case manager; obtain and maintain a legal, stable source of income and provide proof to the case manager; complete a monthly budget (and timely supplements) to assist with timely determination of ability to pay for services/treatment ordered by the court; submit to a co-occurring evaluation within 20 days as arranged by DHHS; participate in family support services to assist with housing and employment; timely notify the court of any services she deemed necessary to assist with the return of the child to the parental home; and notify the court, her attorney, and DHHS of any change of address and phone number within 48 hours of said change.

Following a continued disposition and permanency planning hearing in April 2020, Erica was also ordered to successfully complete "Level I" intensive outpatient treatment; have reasonable rights of supervised visitation; not engage in conduct/behavior which would result in incarceration thus making her unavailable to participate in her rehabilitation plan; and sign necessary releases to allow DHHS to obtain mental health and probation reports. Following subsequent review hearings, Erica was also ordered to submit to random drug testing within 4 hours of a request by the case manager; call by noon the day prior to a scheduled visit to confirm she will attend; meet with her case manager by the 10th day of each month; enroll in and

successfully complete "IOP" substance abuse treatment; and demonstrate sustained measurable progress in treatment and not engage in conduct which would result in unsuccessful discharge.

Following a review hearing on September 14, 2021, the juvenile court found and ordered that "[n]o further efforts to effectuate a plan of reunification shall be required," "[h]owever, [Erica] still has an obligation of self-help measures and past orders of the court shall serve as a guide to said efforts."

On September 19, 2023, Z'Ryah's guardian ad litem (GAL) filed a motion to terminate Erica's parental rights to Z'Ryah pursuant to Neb. Rev. Stat. § 43-292(6) and (7) (Reissue 2016). The GAL alleged that: reasonable efforts to preserve and reunify the family, if required, failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); the child had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Erica's parental rights was in the child's best interests.

On April 10, 2024, the juvenile court entered an "Order to Modify Visitation With the Mother." It stated that "this matter came before the Court for consideration of the Ex Parte Motion to Modify Visitation with the Mother filed on behalf of [DHHS] requesting to modify the current agency supervised visitation to be therapeutic visitation only." The court ordered that visitation between Z'Ryah and Erica be "therapeutic visitation only," and a hearing was scheduled for a later date. However, on July 23, DHHS filed a "Withdrawal of Ex Parte Motion to Modify Visitation and Motion to Cancel Hearing"; the juvenile court cancelled the scheduled hearing.

2. TERMINATION HEARING

The parental rights termination hearing was held on August 12 and 13 and September 20, 2024. Erica was incarcerated at the time and appeared via videoconference. The State orally joined the GAL's motion to terminate Erica's parental rights. The GAL called several witnesses to testify, and numerous exhibits were received into evidence. Erica did not testify, and she did not call witnesses to testify on her behalf.

(a) Witness Testimony

Betsy Miller had been a child and family services administrator with DHHS since November 2023, and prior to that she was a child and family services supervisor for 7 years. Miller testified that she was the supervisor on this case from "approximately June of 2020 until around November of 2023." When the case was assigned to her team, Miller reviewed "everything available" in the N-FOCUS computer system, which is "the State of Nebraska database" "where all of the documentation is entered." Miller and the new caseworker also had a "transfer staffing" with the previous caseworker and their supervisor "so that they could pass on all the information to us."

Miller testified that Z'Ryah was removed from Erica's care in 2019 because there were concerns that Z'Ryah had ingested an illegal substance.

According to Miller, in 2020 Erica was under court orders to complete Level I intensive outpatient treatment, participate in supervised visitation, have safe and stable housing and a legal source of income, and maintain communication with her case manager. However, Erica was not participating in treatment and had not been regularly participating in supervised visitation. Additionally, DHHS did not have information on the status of Erica's housing or employment.

By August 2022, Erica had an apartment, but Miller was not able to verify that Erica had a source of income. DHHS had not been able to set up treatment for Erica because she had not communicated with Miller or the case manager. In January 2023, the only service that was set up was visitation because Erica was in the Douglas County Corrections facility.

During Miller's time on the case, Erica had active arrest warrants for theft and shoplifting, and she was incarcerated "[a]t least two" times. This concerned Miller because Erica "continued to be arrested on charges that took her away from her child and prevented her from being able to participate in services to work towards reunification." Miller never recommended that Z'Ryah be reunified with Erica because "[Erica] was never in a place where she would have been able to have placement of Z'Ryah both physically and in terms of completing services and . . . court orders."

Ivett Cuadra, a child and family specialist with DHHS, was first assigned to this case from August 2020 to July 2022. She testified that this family became involved with DHHS "due to homelessness and also Z'Ryah at the time eating some kind of gummy that contained marijuana in it."

Cuadra said that Erica completed a chemical dependency evaluation, participated in family support, and completed a budget. Cuadra never had difficulty contacting Erica, but she was not consistent in her communication with Cuadra and was disrespectful to her. During Cuadra's time on the case, Erica was incarcerated on more than one occasion. A family support worker had been set up for Erica but was discharged due to Erica's incarceration.

Cuadra testified that there were times when Erica let her know that she was living with friends; Cuadra did not do walk throughs of those places. Erica also lived in an apartment in Omaha, Nebraska, for "[a]bout a year." Cuadra completed three walkthroughs of the apartment, had no concerns about it, and visits occurred in that apartment. Then, during a phone call in June 2022, Erica told Cuadra that she was residing in Kansas City. Cuadra was concerned because of the visitations and because Erica was on probation at the time and was not allowed to be out of the state. Cuadra asked Erica if she let her probation officer know that she was living in Kansas City, and Erica responded that she had not; Cuadra told Erica to contact her probation officer and Erica said she would. Erica also told Cuadra that she was coming to Omaha to visit Z'Ryah but that she could not attend all of the visits. Cuadra asked Erica if she was participating in drug testing (her UAs were completed through probation), and Erica said that she was. Cuadra last spoke to Erica in June. At the end of Cuadra's time on this case in July, she believed that Erica was still living in Kansas City.

"Due to the housing situation," the unstable income, and information she received regarding UAs, Cuadra never felt that it was safe and appropriate for Z'Ryah to be sent to Erica's home.

Holly Twiford had been a child and family services specialist lead with DHHS since December 2023, and prior to that was a child and family services specialist. She was assigned to this case in July 2022 and was the current case manager at the time of the termination hearing.

Twiford stated that when she first became involved in the case, Erica was incarcerated at the women's correctional facility in York, Nebraska, and had been there approximately 4 months at that time; Erica was subsequently released in August 2023. After her release, Erica resided at the Catherine Rylee House, "basically a halfway house for women," for 4 months. Following the Catherine Rylee House, Erica lived in a homeless shelter for 2 to 3 weeks, and then at a facility

called Grace365 for 90 days. After that, Erica told Twiford she was working on getting an apartment.

Twiford was asked if Erica ever provided verification of her employment. Twiford responded, "When she first got the job at [a restaurant] . . . . I want to say, October or September of 2023. And then she began working for a temp company. And so that was a little bit before Christmas of '23 as well." Erica also gave her paystubs from the restaurant and the "temp company" in March 2024.

Twiford had consistent contact with Erica, but since approximately November 2023, it was not always "productive." Twiford stated, "I feel like our communication is constantly battling, constantly butting heads. She knows best, can't take advice, can't listen to anything I have to say in regards to how to manage this case, how to help her, how to move forward." Twiford answered affirmatively when asked if at one point she "actually blocked [Erica]" from her (Twiford's) phone; Erica was given the email and phone number for Twiford's supervisor for contact purposes. When asked if it was "normal for case managers to block clients," Twiford responded, "I would say that it is normal in situations where the parent is verbally disrespectful and combative and makes threats against a case manager."

Twiford met with Erica approximately eight times in person and also communicated with her via text and phone. On more than one occasion, Twiford had to talk to Erica about not making promises to Z'Ryah, not discussing the case with Z'Ryah, and not making negative comments about Z'Ryah's placement. Additionally, Twiford talked to Erica about not allowing other people to be present at her visits with Z'Ryah. In March 2024, Twiford specifically told Erica that neither Erica's girlfriend nor the girlfriend's child was to be at visits; Erica's response was "not good" and "she basically told me she can't help where people are when she's having visits." In April, Twiford asked Erica about her housing, asked if she was still being drug tested with her parole officer, and asked for pay stubs; "[t]he response I got was that it was none of my business." Then, "[Erica] told me that I was a weird ass bitch and that because my mother never got me back, I was on a path to make sure that she did not get her child back and that she would beat my ass if she had the chance." "[B]ecause of how Erica] was treating me," subsequent "communication went directly to my supervisor."

During Twiford's time on the case, Erica had agency supervised visitation. Twiford stated the visitation stopped after she submitted an affidavit in March 2024 with concerns "that things were happening during the visits that shouldn't have happened"; "[t]hings were being said to Z'[R]yah that were inappropriate, there [were] still promises being made to the child and people coming to visit that shouldn't have." It was Twiford's understanding that the juvenile court ordered that Erica was not to have visitation until that issue got resolved, and the court ordered therapeutic visits to be set up. From March to July 2024, Twiford "had a super hard time finding a provider." She eventually got therapeutic visits set up for July, but the visits did not take place; the first visit "did not occur because there was miscommunication with transportation" and "[t]he second visit did not occur because Erica did not show up."

Twiford learned that at the beginning of August 2024 Erica was in the women's correctional facility, where she remained at the time of the termination hearing. When asked if she knew what charges Erica had pending, Twiford responded, "[A]ccording to NDEN, she has absconding from parole, assault with a deadly weapon, and then some other parole violations."

Twiford was concerned about Erica's "protective capacities in general for her child and her ability to provide Z'[R]yah with her basic needs and overall safety as she has not been a consistent participant in this case." Additionally, "By way of her criminal activity, [Erica] makes herself absent in her child's life." "Also, if [Z'Ryah] were to ever be in a situation where her mom decided to break the law in any way, she could be compromising [Z'Ryah's] safety." Twiford did not believe that Erica had made measurable, sustained progress towards reunification.

Rachel Tackett, a licensed mental health practitioner and certified professional counselor, testified that she began providing weekly therapy to Z'Ryah in February 2024. Z'Ryah had been diagnosed with PTSD and an adjustment disorder with mixed anxiety and depressed mood. The primary treatment goal was "emotional regulation, building coping skills, identifying her emotions correctly, and being able to articulate those and then also to process her trauma." According to Tackett, Z'Ryah was "doing well right now in general" and "making progress towards her treatment goals." However, "we have not really even begun to process through her trauma," "we're still primarily working on the emotional regulation and coping strategies that she will need in order to be able to effectively process her trauma."

Tackett stated there "have been a few occasions" when Z'Ryah was upset. Z'Ryah reported stress over some of the things that she had talked about with her mother on visits. For example, Erica told Z'Ryah that the reason she was not home yet was because of the things she was discussing with Tackett in therapy; Erica told Z'Ryah that "the state gets a lot of money by keeping her in foster care"; and Erica called Z'Ryah "disloyal." Tackett helped Z'Ryah process her feelings of confusion, sadness, shame, and anxiety.

Tackett said that a safety plan was put in place in April 2024, because Z'Ryah "made some vague statements during one of our sessions that she was thinking about hurting herself"; "[a]t that time, she expressed that she was worried about her mother" because she had not heard from her mother in a few weeks and was concerned that her mother might be in jail. Z'Ryah also reported that she overheard a phone call when her mother threatened Z'Ryah's foster mother (her mother made a comment that she knew where the foster parent lived); Z'Ryah felt sad, worried, and confused. In July, Z'Ryah "was supposed to have a visit with her mother and a therapist, and her mother did not attend." Tackett never recommended family therapy with Erica because "the things that we're working on in treatment needed to be addressed and [Z'Ryah] had not at that time made enough progress for me to feel that family therapy was appropriate."

Tackett testified, "The majority of the stressors and anxieties that Z'Ryah has reported to me are in regard to her mother and not knowing what her future holds," "[s]he feels very untethered as far as what comes next and where she should go." When asked if Z'Ryah mentioned to her what she wants her future to look like, Tackett responded, "She wants to live with her mother." Tackett opined that Z'Ryah needed permanency.

Lynn W., Z'Ryah's foster mother, testified that Z'Ryah was placed in her home in December 2020 and remained there at the time of the termination hearing. Z'Ryah was getting good grades in school and was going to be in sixth grade. In March 2024, the foster mother was contacted by the school because Z'Ryah was having a hard time; just prior to that, Z'Ryah had a visitation with Erica. Lynn "reassured [Z'Ryah] basically that she was loved and that nobody was using her for money purposes or benefits and that she didn't have to worry about nothing like that." In April, Lynn was threatened by Erica. She said Erica called her and yelled at her, saying:

"You think this is okay, that I have not seen my daughter in months? And you're the reason why. You just keeping her because you're getting paid. You really don't even want her. . . . [W]hen I see you, I'm going to beat your ass. Bitch, I will come to your house. I know where you live at."

The next day, Lynn told Z'Ryah's case worker what had happened.

According to Lynn, at the time of the termination hearing, Z'Ryah had not had a visit with Erica in approximately 4 months, but prior to that they were scheduled to have visits twice a week. When a scheduled visit did not occur, Z'Ryah was sad.

(b) Court Reports and Case Plans

Several DHHS court reports and case plans were received into evidence. We summarize the contents here.

The September 2020 court report (authored by Cuadra) states that Erica was not participating in any treatment and was not communicating with her case manager. Erica had been incarcerated in February. She had parenting time from April 20 to July 20 but was then discharged by the service provider due to lack of participation. Erica was incarcerated in July for shoplifting. Supervised visitation with a different visitation provider began on August 18.

The January 2021 case report (authored by Cuadra) states that Erica was not participating in any treatment and did not have stable housing, but she had been employed with various entities (for 2 weeks each with two different employers, and "over a month" with her then current employer) and was working with a family support worker. Erica participated in "some" of her visits with Z'Ryah, but many were cancelled or missed; she attended 12 of 39 visits from September through November 2020. When Erica did attend visits, she interacted well with Z'Ryah and there were no safety concerns. From October through December, Erica "completed" 10 of 20 "attempts to [drug] test"--she tested positive for marijuana once in October, twice in November, and twice in December.

The June 2021 court report (authored by Cuadra) states that Erica had been working with a family support worker on budgeting and housing. She had not shown proof of a legal source of income and stated she was "actively looking for employment" and was "doing hair for a source of income." She had not shown proof of safe, stable, and adequate housing. In February, Erica was accepted to "the Lydia House," but she decided not to stay because she did not want to participate in their programs. In April, Erica was put on probation for 24 months due to a DUI. Her probation officer helped her get accepted into the "Our Square" program on May 6, but Erica decided to leave the program that same day. The case manager had no information about where Erica resided after May 6. Erica enrolled in "IOP" treatment in May, but attended only one session, citing "transportation issues." Erica subsequently enrolled in a different IOP but had missed sessions. She was drug testing through probation, and "[r]eports from probation" indicate she tested positive for marijuana and PCP. Erica attended 15 of 30 visits with Z'Ryah from February through April, and no safety concerns were noted.

The September 2021 court report (authored by Cuadra) states that Erica contacted the case manager in June because she obtained an apartment; the case manager completed a walk through. Erica had not shown proof of a legal source of income. Erica had been incarcerated since July 29.

"Reports from probation indicate that before being incarcerated, Erica . . . was not participating in UA's with probation." Erica was enrolled in treatment through probation but had not completed treatment due to being incarcerated. And due to her incarceration, Erica was discharged from family support services and was not participating in visitation with Z'Ryah.

According to the March 2022 court report (authored by Cuadra), at a review and permanency planning hearing held on September 14, 2021, it was ordered that no further reasonable efforts to effectuate a plan of reunification would be required, but that Erica still had an obligation of self-help measures, with past court orders serving as a guide. The March 2022 report stated that Erica had kept "minimal contact" with the case manager and did not show up for scheduled meetings. She was incarcerated for a 1-day sentence in January due to "assault and battery," and was on probation for shoplifting and theft. Erica was supposed to "begin treatment," but the service provider reported that Erica had rescheduled all of her appointments and had not yet begun services. Erica attended 7 of 9 visits with Z'Ryah in the 1 month that the case manager had received a visitation report for that review period.

The August 2022 court report (authored by supervisor Miller) stated that Erica continued to have "very little contact or communication" with DHHS. In June, Erica reported to a case manager that she had moved to Kansas City but was still returning to attend her visits with Z'Ryah. Erica was "mostly consistent with her parenting time" with Z'Ryah, which was held twice per week. Aside from participating in supervised visits, the case manager did not believe that Erica was participating in any treatment or other services that would assist her in reunification. In July, the child and family service supervisor received a notification from the Douglas County Attorney's Office stating that they were "'filing a warrant on Erica . . . for 2nd Degree Assault, for her involvement in a domestic incident where she stabbed her partner with scissors. I have had a warrant out on felony shoplifting since June 6, 2022. Law enforcement suspects she may have fled to the Kansas City area.'"

The January 2023 court report (reviewed by supervisor Miller but authored by a case manager who did not testify) stated that Erica continued to have "very little contact or communication" with DHHS. In July and August 2022, Erica was consistent with her parenting time with Z'Ryah and there were no safety concerns. However, Erica was incarcerated on August 30 and the parenting time referral was discharged; "[p]lacement reported Erica does contact Zryah [sic] once a week by phone." According to the court report, "On August 30th, Erica was arrested for 2-Violations of Probation, 2nd Degree Assault, 2-Theft by Shoplift of $5,000.00 or more, 1-Theft by Shoplift of $1500.00-$4999.00, and 2-Theft by Shoplift of $500.00."

The August 2023 court report (authored by Cuadra) stated that Erica continued to have "very little contact or communication" with DHHS. Erica was currently incarcerated and was therefore not participating in supervised visits with Z'Ryah, but did speak to her on the phone weekly.

The March 2024 court report (authored by Twiford) stated that Erica was released from prison in August 2023 and went to the "Catherine Rylee House," but she was asked to leave in December for not abiding by their rules. Erica informed her case manager that she was working for two businesses and provided four paycheck stubs to her case manager. Erica participated in supervised visits with Z'Ryah two times each week and visits were "mostly consistent." However,

Erica no longer consistently called to speak with Z'Ryah at her foster home. According to the report:

> Erica lacks the understanding of the reality of her CFS case. Erica has stated several times that "no one has done shit for her". When asked by [the case manager] what she is in need of or what she thinks DHHS should be doing that we are not, Erica states that DHHS should be giving her child back to her. Erica has been reminded several times that having her child wait for 4+ years in the custody of . . . DHHS in order for her to possibly become a safe and stable parent has been taxing on her child's overall wellness. [The case manager] has also informed Erica that by making Zryah [sic] promises to come back home is not ok, nor fair but is actually damaging to her child and their relationship.

(c) Erica's Criminal Court Cases

Certified copies of several criminal court cases in the county and district court show the following.

In December 2017, Erica was charged in district court with possession of a controlled substance--i.e., "Base Cocaine (Crack)"--a class IV felony. Erica pled guilty in February 2018. In March 2020, she was sentenced to 18 months' imprisonment and was given 237 days' credit for time already served.

On August 11, 2020, Erica was charged in district court with "Theft By Shoplifting 3 or More $500 or Less," a Class IV felony, for an incident that occurred in July. After entering a plea of no contest, she was sentenced to 12 months' probation in January 2021. However, on March 2, 2023, Erica admitted to a charge of "Violation of Probation," and she was sentenced to 90 days' imprisonment. Her sentence was to run concurrent to any other charge. And the court stated that "[c]redit for time served for 53 days shall be given against the sentence imposed."

On August 26, 2021, the county court held a probation violation hearing, and after Erica admitted to violating the conditions of her probation, her probation was revoked. The court sentenced Erica to 30 days in jail for misdemeanor "DUI=>.15-NO PRIOR," and her driver's license was revoked for 1 year, with an "ignition interlock permit ordered."

On September 10, 2021, Erica was charged in county court with "Open Alcohol Container" (infraction), "No Registration" (infraction), and "Driving During Revocation/Impoundment" (Class II misdemeanor) for an incident(s) that occurred in July. In September she pled guilty to driving during revocation/impoundment and the other two charges were dismissed. Erica was sentenced to 1 day in jail and she was given credit for time served; her driver's license was revoked for 1 year.

On September 13, 2021, Erica was charged in district court with theft by shoplifting $1,500 to 5,000, a Class IV felony, for an incident that occurred in July; after entering a plea of no contest, she was sentenced to 12 months' probation in November. On March 2, 2023, after admitting to a charge of "Violation of Probation," she was sentenced to 90 days' imprisonment. Her sentence was to run concurrent to any other charge. And the court stated that "[c]redit for time served for 53 days shall be given against the sentence imposed."

On January 24, 2022, Erica was charged in county court with one count of assault and battery in violation of an Omaha city ordinance; that same day she pled guilty, was sentenced to 1

day in jail, and was given a "Domestic Violence" notice (regarding her ability to possess or purchase a firearm).

On October 11, 2022, Erica was charged in two separate district court cases with theft by shoplifting $5,000 or more, a Class IIA felony, for incidents that occurred in August. After entering pleas of "no contest" on March 2, 2023, she was given identical sentences of 2 to 5 years' imprisonment, with 186 days' credit for time already served. Her sentence in each case was to run concurrent to any other charge.

On July 23, 2024, a district court in Iowa entered an order indicating that Erica had been charged with being a "Fugitive From Justice" and she was "informed of the nature of the proceedings and submits a written waiver of extradition." The court ordered that Erica "shall be turned over to a peace officer from the State of Nebraska as soon as possible for prosecution in that State."

### 3. JUVENILE COURT'S DECISION

In an order filed on November 20, 2024, the juvenile court found that Miller, Cuadra, Tackett, and Lynn were reliable, credible witnesses. The court "struggled with the weight to be accorded to the testimony of . . . Twiford primarily due to the fact that by her own admission, she was confused about some timeframes"; "[w]ith respect to that portion of her testimony, the court does not find her to be reliable, credible, or entitled to weight in this regard only" and "[t]he court finds the timeframes of the other witnesses more reliable, credible, probative, and entitled to weight." The court then terminated Erica's parental rights to Z'Ryah after finding by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(6) and (7), and that termination of Erica's parental rights was in Z'Ryah's best interests.

Erica appeals.

### III. ASSIGNMENTS OF ERROR

Erica assigns that (1) the GAL did not include § 43-292(2) in the motion for termination of her parental rights, (2) the juvenile court erred in finding that statutory grounds exist to terminate her parental rights under § 43-292(6) and (7), and (3) the juvenile court erred in finding that termination of her parental rights was in Z'Ryah's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

### V. ANALYSIS

#### 1. STATUTORY GROUNDS FOR TERMINATION

We initially note that Erica assigns error to the fact that the GAL did not include § 43-292(2) as a statutory basis for termination in the motion for termination of Erica's parental

rights. However, the GAL was not required to include § 43-292(2) in its motion; moreover, the juvenile court did not make any findings regarding § 43-292(2).

The GAL sought to terminate Erica's parental rights to Z'Ryah under § 43-292(6) and (7). The juvenile court found that both of those grounds existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

Z'Ryah was removed from Erica's care in November 2019 and remained in foster care thereafter. By the time the motion to terminate Erica's parental rights was filed on September 19, 2023, Z'Ryah had been in an out-of-home placement for nearly 46 months. The 15-out-of-22 months' period was clearly satisfied.

The GAL has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Erica's parental rights to Z'Ryah. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*.

We next consider whether termination is in Z'Ryah's best interests.

2. BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Erica argues that she "displayed progressing parenting ability and had an established beneficial relationship with [Z'Ryah]" and "[Z'Ryah] wanted to be with her." Brief for appellant

at 17-18. Erica further argues that the record was "devoid of information about Z'Ryah and her specific needs" and it also "completely failed to provide proof of how or why the severance of [Erica's] parental bond would be favorable to Z'Ryah." *Id.* at 19. However, the Nebraska Supreme Court has held that having a bond with a child does not make the parent a fit person to provide parental care for the child. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Erica has not made consistent, sustained progress toward reunification in this case. She has failed to maintain regular contact with DHHS, failed to maintain safe and stable housing, had continued criminal conduct resulting in probation and repeated incarcerations, and she had positive drug tests through probation. Additionally, Erica's periods of incarceration interfered with her ability to have visits with Z'Ryah and perform her parental obligations. See *In re Interest of Jahon S.*, 291 Neb. 97, 105, 864 N.W.2d 228, 235 (2015) (incarceration alone cannot be sole basis for terminating parental rights, but it is factor to be considered; although incarceration itself may be involuntary, criminal conduct causing incarceration is voluntary; "[t]hus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration").

By the time of the termination hearing, Z'Ryah had been in an out-of-home-placement for more than 4 years. Tackett opined that Z'Ryah needed permanency. We agree. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The GAL proved that Erica was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *id.* We further find that there is clear and convincing evidence that it is in Z'Ryah's best interests to terminate Erica's parental rights.

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Erica's parental rights to Z'Ryah.

AFFIRMED.